IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| DARIUS TYRELL SCOTT,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>　　　　　Defendant. | CASE NO. 4:22-cv-878<br><br>DISTRICT JUDGE<br>PAMELA A. BARKER<br><br>MAGISTRATE JUDGE<br>JAMES E. GRIMES JR.<br><br>**REPORT &<br>RECOMMENDATION** |

Plaintiff Darius Tyrell Scott filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying Child's Disability Insurance Benefits and Supplemental Security Income. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). This matter has been referred to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

**Procedural history**

In November 2016, Scott filed applications for Child's Disability Insurance Benefits and Supplemental Security Income alleging a disability

onset date of June 30, 2016,[1] and claiming he was disabled due to post-traumatic stress, anxiety, severe depression, schizophrenia, and a learning disability. Tr. 231, 235, 255. The Social Security Administration denied Scott's applications and his motion for reconsideration. Tr. 147–50. Scott then requested a hearing before an Administrative Law Judge (ALJ). Tr. 171.

In May 2019, an ALJ held a hearing. Scott and a vocational expert testified. Tr. 76–112. The next month, the ALJ issued a written decision finding that Scott was not disabled. Tr. 61–69. The ALJ's decision became final on March 3, 2022, when the Social Security Appeals Council declined further review. Tr. 1-4; *see* 20 C.F.R. § 404.981.

Scott filed this action on May 26, 2022.[2] Doc. 1. He asserts the following assignments of error:

> 1. The ALJ and Appeals Council Judges are not properly appointed under the Appointments Clause of the U.S. Constitution, Article II, section 2, Clause 2 and the Federal Vacancies Reform Act (FVRA) 5 U.S.C. §3346(a), therefore, this matter must be remanded to a properly appointed ALJ for a de novo hearing and decision.

> 2. The ALJ erred by addressing "Paragraph C" of listing 12.04 in a cursory manner to the extent that his unfavorable decision is not based upon substantial evidence.

---

[1]     "Once a finding of disability is made, the ALJ must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

[2]     The Appeals Council granted Scott's request for more time to file an appeal in federal court. Tr. 7, 114.

3. The ALJ erred at Step 2 by failing to address the schizophrenia listing 12.03, the anxiety listing 12.06 and the trauma listing 12.15. This is an error of law requiring remand.

Doc. 9, at 1.

**Evidence**

*1.    Personal and vocational evidence*

Scott was born in 1998 and was 17 years old on the alleged disability onset date. Tr. 67. Scott completed ninth grade. Tr. 256. He worked one summer taking care of cats at a shelter. Tr. 82.

*2.    Medical evidence*[3]

In April 2016, Scott was taken by ambulance to St. Elizabeth Hospital after Scott's mother called the police because Scott and his mother had an altercation. Tr. 350. The argument began when Scott and his mother were delivering newspapers; Scott was driving and his mother was giving directions. Tr. 350. The treatment notes states that Scott had a history of aggressive behavior and longstanding anxiety. Tr. 350. He was in a court appointed drug program and in counseling. Tr. 350. He reported having anger issues and wanting to fight people often. Tr. 350. Scott was prescribed medications (Zyprexa and Zoloft) by his primary care doctor in December 2015, but Scott stated that he stopped taking his medications after 3 weeks because they weren't helping. Tr. 350. Scott reported that he used marijuana and drank

---

[3]    The recitation of medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' briefs.

3

alcohol. Tr. 350. Upon exam, Scott had a calm affect, no racing thoughts, and normal speech. Tr. 351. He was cooperative, denied hallucinations, and had above average insight and judgment. Tr. 351. Another provider observed that Scott was anxious, "irritable[] but presently in control," and that "it is not entirely clear" whether Scott was responding to internal stimuli. Tr. 352. A drug screen was positive for benzodiazepines and cannabis. Tr. 351. A social worker was consulted for crisis intervention and a safety plan, and Scott was referred for counseling. Tr. 352.

In May 2016, Scott underwent an initial evaluation at Alta Behavioral Healthcare. Tr. 447–50. Scott's mental status exam was normal and he was diagnosed with anxiety. Tr. 448–50. At that time, Scott was taking Paxil. Tr. 447. In June, Seroquel was added to Scott's medication regimen. Tr. 445.

In July 2016, Scott went to Belmont Pines, a mental health hospital, to be evaluated "for bizarre behavior according to the mother with hallucinations and suspected drug abuse." Tr. 345. Belmont Pines sent Scott to St. Elizabeth Health Center emergency room for drug testing and medical clearance. Tr. 345. Scott's mental exam findings showed a flat affect. Tr. 345. Scott's drug screen was positive for cannabis, so Belmont Pines denied Scott admission. Tr. 346–47.

In late July 2016, Scott was admitted to Smith House, a residential substance abuse treatment center, due to escalating drug use and "alarming behaviors" following the death of a family member. Tr. 414, 428. At intake, a

4

counselor described Scott as being polite and willing, but also naïve and lacking confidence. Tr. 416. He reported affiliation with a gang, which was no longer active, and said that he "just became single." Tr. 416. Scott had a summer job in 2015, but most of his money came from selling drugs. Tr. 419. As to his substance abuse, Scott reported recent use of Xanax, marijuana, promethazine/Codeine, opiates, and alcohol. Tr. 420. Scott described experiencing mood swings, paranoia, depression, and auditory hallucinations. Tr. 421. On mental status testing, Scott had rapid speech and reported auditory hallucinations, although he knew the voices were not real. Tr. 427. Scott's other findings were normal. Tr. 427. The counselor wrote that Scott had adequate judgment and "some" insight. Tr. 427. Scott was diagnosed with opioid, benzodiazepine, alcohol, and cannabis use disorders, adjustment disorder, and rule-out substance-induced psychotic disorder. Tr. 425. Scott was admitted to Smith House. Tr. 436.

A mid-August 2016 progress note stated that Scott reported being abused by his older brother. Tr. 431. Scott's auditory hallucinations had improved but they were still present. Tr. 431. Scott had anxiety from worrying about his auditory hallucinations. Tr. 431. He also reported sadness, anhedonia, isolation, over-sleeping, and irritability. Tr. 431. Scott's exam findings showed a normal appearance and speech, an anxious mood, full affect, and cooperative behavior. Tr. 431. Scott was taking his medications as prescribed. Tr. 431. The counselor added an adjustment disorder with mixed

5

disturbance diagnosis and rule-out substance-induced psychotic disorder "with brief reactive psychosis through auditory hallucinations." Tr. 432. Scott's insight and judgment were "fair" and he had made some progress. Tr. 433.

On August 24, 2016, Scott had a diagnostic assessment at Smith House with James Yokley, Ph.D. Tr. 428. Scott reported being arrested in April 2016 for possession of crack cocaine during a traffic stop. Tr. 428. Scott was on probation but failed several drug toxicology screens. Tr. 428. So the juvenile court sent Scott to Smith House for residential substance abuse. Tr. 428. Scott stated that his substance abuse "preceded his conduct problems." Tr. 428. Scott's mental exam findings showed that he was appropriately dressed, cooperative, and polite. Tr. 429. Scott had normal motor activity and speech. Tr. 429. He had adequate recall, auditory hallucinations, and was open about symptoms of depression, anxiety, and anger. Tr. 429. He reported suicidal ideation with no plan, and sleep and appetite disturbances. Tr. 429. Scott said that he had trouble thinking and believed that he needed an Individualized Education Plan for math and English. Tr. 429. Dr. Yokely found that during the last month in residence, Scott maintained sobriety and had consistent, severe depression with suicidal ideation and constant severe anxiety. Tr. 429. Scott had "constantly elevated state anger" but no "trait anger," and positive screening for bipolar spectrum disorder. Tr. 429. Dr. Yokely concluded, "The consistent presence of elevated mental health symptoms after a month of sobriety tends to indicate the need for increased mental health intervention."

Tr. 430. Dr. Yokley advised that Scott's "request for medication for his voices should be honored" and that Scott should be referred to a psychiatric nurse for evaluation and treatment. Tr. 430. Dr. Yokley added that if Scott "still complains about learning problems" after his treatment, he should be referred for an academic Individualized Education Plan. Tr. 430.

A progress note from late August 2016 from Alta Behavioral Health showed that Scott's symptoms were stable and he had auditory hallucinations. Tr. 443. Scott was diagnosed with schizophrenia. Tr. 443. In September, Scott was listed as "stable." Tr. 441. Scott was "not aggressive now" and slept more. Tr. 441. Scott stated that voices told him he has schizophrenia. Tr. 441. Upon exam, Scott had a flat affect. Tr. 441. The provider wrote that Scott would be referred for a schizophrenia evaluation. Tr. 441. On October 11, Scott's medications were increased and Scott was noted to have made moderate progress. Tr. 439.

On October 14, 2016, Scott was involuntarily discharged from Smith House. Tr. 435. The discharge note stated that Scott "struggled" during his stay—he failed to get along with peers and staff, denied that he had a drug problem and needed treatment, and "eventually" made violent threats towards others. Tr. 435. He was prescribed Paxil. Tr. 436. Scott was independent with personal hygiene, household tasks, personal safety, medication management, and literacy and basic math. Tr. 436. He was "partial[ly]" capable of cooking and managing his nutrition, engaging in leisure and recreational activities,

7

and maintaining social and family relations. Tr. 436. He lacked skills to cope, manage his finances, and prepare for work. Tr. 436. Scott "responded poorly to treatment and did not want to engage." Tr. 436. He was referred back to county services "to determine necessary consequences of failing to complete treatment as recommended." Tr. 436.

In January 2017, Scott went to Alta for medication management. Tr. 553. Scott's goal was to improve focus and impulse control. Tr. 553. Scott's condition was listed as stable and Scott reported ongoing auditory and visual hallucinations. Tr. 553. Scott's exam findings showed decreased eye contact and a blunted affect. Tr. 553. Scott's medications were adjusted and Scott's then-current diagnosis was schizoaffective disorder. Tr. 553. The provider recommended that Scott have a long-acting Abilify injection at his next appointment. Tr. 553.

About a week later, Scott had an intake evaluation at Turning Point Counseling. Tr. 477. Scott said that he only experienced hallucinations when using marijuana—"if I smoke weed, voices come back. [W]hen I'm sober all is fine." Tr. 477. Scott reported successful periods of sobriety lasting up to five months. Tr. 481–82. He enjoyed playing video games and frisbee golf, and he read the Bible and prayed. Tr. 482. Scott's mother then joined the session and stated that Scott began experiencing symptoms of depression and anger at around age 12. Tr. 477.

In February 2017, Scott saw Prasad Guttikonda, MD., at Turning Point Counseling. Tr. 488. Scott advised the doctor that he was in the "final stage of schizophrenia." Tr. 489. Scott reported that he went to rehab, "got [him]self together," and was not "smoking weed." Tr. 489. Scott stated that he has panic attacks, constant worry, and depression. Tr. 489. He was always in a bad mood and used to cry a lot. Tr. 489. He hears voices every day. Tr. 491.

On March 9, 2017, Scott returned to Turning Point. Tr. 498. Scott reported that his medications were helping but he still had auditory hallucinations. Tr. 498. He heard voices say "that they are going to kill [Scott] and his mom." Tr. 498. Scott's exam findings were normal. Tr. 498. On March 20, Scott and Scott's mother reported that Scott had increased symptoms, including becoming violent and breaking items the day before the appointment. Tr. 502. Scott's mother advised that she didn't accompany Scott to his last appointment, and, after discussion, it was discovered that not all of Scott's medications were refilled at his prior appointment. Tr. 502. So Scott hadn't taken his Paxil and Vistaril since his last appointment. Tr. 502. Upon exam, Scott was anxious and paranoid, but his remaining exam findings were normal. Tr. 504–05. At a counseling session following that appointment, Scott presented as cooperative and euthymic[4] but became agitated when discussing current stressors. Tr. 696. Scott's thoughts were tangential throughout the

---

[4]      A euthymic affect is tranquil, neither depressed nor manic. *See, e.g.*, Dorland's Illustrated Medical Dictionary 655 (32d ed. 2012).

9

session, but Scott was easily redirected. Tr. 696. He was "dabbling in [substance abuse] off and on" and agreed to an alcohol and drugs assessment to occur the following week. Tr. 696. Scott asked for a list of Narcotics Anonymous meetings which the counselor provided. Tr. 696–97.

In late March 2017, Scott saw a counselor at Turning Point as part of his initial evaluation process. Tr. 492. Scott's exam findings showed that Scott had a normal appearance and was mildly "avoidant" and "slowed." Tr. 492. Scott's thought content was mildly persecutory and he had delusions. Tr. 492. Scott's thought processes were mildly tangential and racing. Tr. 493. Scott had a euthymic mood and a moderately flat affect. Tr. 493. He was cooperative, had no cognition impairments, and had fair judgment and good recall. Tr. 494. Scott said that he was on probation and lived with his mother in a "tremulous environment." Tr. 495. His medications worked "sometimes." Tr. 496. He had high levels of anxiety and heard voices about once a week. Tr. 496.

In early April 2017, Scott had a counseling session at Turning Point and appeared depressed with a blunted and flat affect. Tr. 692. Scott reported that he heard voices once during the week before his appointment. Tr. 692. He stated that Paxil was not helping his anxiety, so he took an unprescribed Xanax the week before to cope. Tr. 694. On April 10, Scott reported having used marijuana and Xanax the weekend before his appointment and admitted that they increased his agitation and psychotic symptoms. Tr. 692. He wanted a prescription for benzodiazepines. Tr. 692.

In mid-April 2017, Scott had a medication management appointment at Turning Point. Tr. 635. Scott reported experiencing hallucinations 7 to 10 days before his next scheduled Abilify injection. Tr. 635, 637. He stated that his anxiety increased to "panic level" when he contemplated going out in public—at those times he took gabapentin. Tr. 635. But sometimes the gabapentin wore off too fast "and he has to cut time short with family and friends." Tr. 635. Scott's medications were adjusted with an aim toward lasting the whole period between injections. Tr. 636. Scott's exam findings showed a depressed and anxious mood and affect and Scott's other findings were normal. Tr. 637. At a counseling appointment on April 24, Scott had slow speech and a blunted affect. Tr. 689. His insight and judgment were fair. Tr. 689. Scott denied "any psychotic symptoms" and "hadn't heard voices in over two weeks." Tr. 689. He "appeared to be more subdued" during the session, but, when asked, stated that he was "just tired." Tr. 689. Scott reported that his recent medication change was "helpful to him." Tr. 689.

In early May 2017, Scott had a counseling session at Turning Point. Tr. 687. Scott denied any symptoms; had a normal mental status exam; and his new medication "appear[ed] to be working." Tr. 687. Scott expressed remorse about his decision to not attend a court date a week before the appointment. Tr. 687. On May 10, Scott reported some auditory hallucinations as he neared the end of his injection cycle. Tr. 684. Scott "like[d] this injection much more than the previous one" and felt it was more effective. Tr. 684. Scott's mood

11

"seemed down" but Scott explained that the appointment time was earlier than he was used to getting up. Tr. 684. He also stated that he had not used benzodiazepines during the 3 weeks before the appointment. Tr. 684. On May 23, Scott and his mother said that Scott's new medication was helping "immensely," and that Scott was no longer having breakthrough hallucinations before his next scheduled injection. Tr. 507. Scott's exam findings showed that Scott was depressed (rated 4 out of 10) and anxious (rated 8 out of 10) and was otherwise normal. Tr. 509–09.

On June 2, 2017, Scott had a counseling session at Turning Point and reiterated that his medication was helping. Tr. 679. His anxiety level was down to a 5 out of 10—the lowest he could recall. Tr. 679. Upon exam, Scott was cooperative and euthymic, his speech was normal, and his thinking was concrete but "appeared blocked at times." Tr. 679.

In early July 2017, Scott had a counseling appointment. Tr. 672. Scott was "cooperative and euthymic." Tr. 672. He had slow speech, concrete thinking, and a full and congruent affect. Tr. 672. Scott and the counselor discussed a phone call the counselor received from Scott's mother about Scott having difficulty getting out of bed and meeting basic needs. Tr. 672. Scott explained that it was due to anxiety. Tr. 672. He also expressed feeling "some anger and ambivalence about continuing in Mental Health Court." Tr. 672. Scott was spending time with his cousins, which decreased his anxiety. Tr. 672–73. On July 17, Scott was quiet and withdrawn and had a flat and blunted

12

affect. Tr. 667. He avoided eye contact and his thinking appeared blocked. Tr. 667. He has not been taking Xanax and felt that he was getting better at managing his symptoms without medication. Tr. 667. On July 24, Scott said that he was taking Xanax again, which helped him. Tr. 664. He was getting out more and playing basketball. Tr. 664. Scott's thoughts were logical but "blocked at times" and Scott's other exam findings were normal. Tr. 664.

On August 2, 2017, Scott saw Brian Sullivan, M.D., at Turning Point for a medication adjustment. Tr. 511. Scott said that he was hearing voices again, felt anxious all the time, and didn't talk "to anybody." Tr. 511. He reported that he may be sleeping too much and it was "hard to wake up." Tr. 511. Dr. Sullivan commented that Scott was very soft spoken with a mild delay in answering. Tr. 511. Dr. Sullivan adjusted Scott's medications. Tr. 513.

On August 7, 2017, Scott had a counseling appointment and appeared lethargic and sleepy, with slowed speech, a flat and blunted affect, and slightly delayed response time when thinking. Tr. 659. Scott said that he stopped taking his Seroquel—Scott explained that he was feeling better and didn't think he needed it. Tr. 659. Scott agreed to take his Seroquel until he saw the doctor the following month, rather make his own adjustments. Tr. 659. Scott reported being "out and … more social with his peers. Tr. 659. The next day, Scott received his Aristada injection and reported "improved symptomology," a stable mood, and no medication side effects. Tr. 713. On August 21, Scott was cooperative and euthymic. Tr. 653. He had slowed speech, a flat and blunted

13

affect, avoidant eye contact, and appeared to struggle at times with forgetfulness and blocked thoughts. Tr. 653. Scott reported improved anxiety and being more social. Tr. 653. He said that the day after the appointment he planned to register for school. Tr. 653.

On September 5, 2017, Scott had his Aristada injection, reported good results from his medication, and denied side effects. Tr. 711. On September 11, Scott had a counseling appointment and had similar exam findings as his prior visit. Tr. 649. Scott reported that he heard voices periodically but he couldn't understand what they're saying—"it is just noise." Tr. 649.

In October and November 2017, Scott received his Aristada injections and reported a stable mood. Tr. 706, 709.

On December 1, 2017, Scott saw Jeff Rindsberg, Psy.D., for a consultative exam. Tr. 520. Scott reported using Xanax about one month prior to the exam and marijuana "a long time ago." Tr. 522. Scott described a typical day—he sleeps and plays video games. Tr. 522. He can dress, attend to his hygiene, and shop. Tr. 522. Scott makes his bed but isn't motivated to do other chores. Tr. 522. His mother cooks for him. Tr. 522. He doesn't socialize. Tr. 522. One of Scott's friends has a car and "provides transportation [to Scott] when need be." Tr. 522. Scott said that his biggest problem throughout the day is depression and anxiety. Tr. 522. Upon exam, Scott had a reserved demeanor, made one error on the serial 7's subtraction task, recalled 2 out of 3 items after a delay and all 3 after being given a cue, and could interpret 1 out of 3 proverbs.

14

Tr. 522–23. Scott's remaining findings were normal. Tr. 522–23. Dr. Rindsberg concluded that substance-induced psychosis is "surmised" based on Scott's reported history and that Scott's mental illness included depression and anxiety. Tr. 523. Scott's prognosis was fair. Tr. 524. Dr. Rindsberg opined that Scott could understand, remember, and carry out instructions; maintain attention and concentration without "major issue"; and "keep up and maintain persistence and pace" to complete tasks. Tr. 524. Scott would have a "major challenge" interacting with the public and co-workers and no "major problem" handling pressure. Tr. 524.

On December 4, 2017, Scott returned to Dr. Sullivan and said that his hallucinations were gone. Tr. 624. Scott said that doesn't like to be out in public and it's hard to get out of bed in the morning. Tr. 624. Scott "d[id]n't usually leave the house, but [was] socializing more." Tr. 624. Dr. Sullivan remarked that Scott had little to say and questioned whether that was due to alogia (poverty of speech) or guardedness. Tr. 624. Dr. Sullivan adjusted Scott's medications. Tr. 626. Two days later, Scott had a counseling session and reported feeling good and not experiencing any hallucinations or delusions. Tr. 698. The counselor commented that Scott was calm and focused during the session. Tr. 698. On December 29, Scott reported more auditory hallucinations after his Seroquel dosage was decreased. Tr. 704.

On January 26, 2018, Scott had a counseling appointment with a new counselor at Coleman Counseling. Tr. 766. Scott was withdrawn, felt nervous,

15

and reported sometimes feeling judged by others. Tr. 766. Scott's remaining exam findings were unremarkable. Tr. 766.

On February 5, 2017, Scott had a counseling appointment at Coleman and his exam findings were similar to his prior visit. Tr. 770. Scott was attending school online and was at the 10th grade level. Tr. 770. Scott stated that he wanted to complete his schoolwork, but he was bored and spent only one hour a day, instead of the recommended 5 hours a day, on his work. Tr. 770. Scott reported anxiety, especially when interacting socially. Tr. 770–71. On February 19, Scott reported that was able to get up earlier—11:00 a.m. instead of 2:00–4:00 p.m. Tr. 774. He wasn't completing his schoolwork and expressed a fear of failure if he tried to, and didn't, succeed. Tr. 774. Scott's exam showed that he was cooperative but withdrawn. Tr. 774. Scott rated his anxiety level as a 4 out of 10 and his other exam findings were normal. Tr. 774.

On February 27, Scott saw Dr. Sullivan for medication management and Scott's mother attended the appointment. Tr. 719. Scott's Seroquel dosage had been restored after Scott had hallucinations on a lower dose. Tr. 719. It was reported that Scott "was itching and ripped off his clothes and ran outside." Tr. 719. On the day of his visit, Scott's hallucinations were described as "mild." Tr. 722. Scott also reported trouble sleeping and anxiety. Tr. 722. Scott's exam findings showed a limited fund of knowledge, "medium" insight and judgment, and were otherwise normal. Tr. 720–21. Dr. Sullivan diagnosed schizophrenia with mild hallucinations; moderate "sedative, hypnotic or anxiolytic use

16

disorder"; and moderate cannabis and alcohol use disorders. Tr. 722. Dr. Sullivan increased Scott's Seroquel dosage. Tr. 722.

On March 5, 2018, Scott had a counseling appointment and rated his anxiety level as 2 out of 10. Tr. 778. Scott wasn't logging into his on-line classes and wanted to resolve his "'focusing' [and] 'anxiety' issues before dealing with schooling." Tr. 778. Scott admitted that he could focus on things he was interested in. Tr. 779. He stayed awake into the early hours of the morning pre-occupied with social media. Tr. 779. He denied abusing Seroquel despite reports from his mother and case manager to the contrary. Tr. 779. Scott was scheduled to graduate from Juvenile Mental Health Court on March 15. Tr. 779. On March 19, Scott reported that he missed his court graduation because he slept in. Tr. 782. Scott reported auditory hallucinations multiple times per day. Tr. 738. He said that his medication helped and he received his Aristada injection. Tr. 738.

In May 2018, Scott's exam findings were normal. Tr. 742–43, 786–87. On May 11, Scott was doing "fairly well." Tr. 787. On May 30, Scott said that he was doing well and his mood was stable. Tr. 787.

In July 2018, Scott had a counseling appointment and reported hearing "a little bit" of voices critiquing his life. Tr. 724. He had "some" depression, "a lot of anxiety," no panic attacks, "better" concentration, and he was angry "a lot." Tr. 724. Scott and his mother were homeless at that time and living with relatives. Tr. 724. Scott's mother reported that Scott became agitated 2–3

17

weeks before his Aristada injection. Tr. 729. Upon exam, Scott's behavior was average, cooperative, mistrustful, and withdrawn. Tr. 726. Scott had normal eye contact and clear speech. Tr. 726. Scott's thought content was blocked, Scott appeared internally stimulated, and he had a constricted and anxious mood and affect. Tr. 726. Scott's medications were adjusted. Tr. 729.

On September 5, 2018, Scott received his Aristada injection. Tr. 750. He reported some auditory hallucinations but had no abnormal mental exam findings. Tr. 750–51.

On October 4, 2018, Scott had an appointment with a new counselor at Coleman Psychiatry. Tr. 731. Scott complained that anxiety prevented him from talking to people. Tr. 731. He said that he didn't have enough energy for activities of daily living. Tr. 731. Scott's mood was "not bad" and he reported more irritability. Tr. 731. Scott's exam findings showed good grooming; normal speech and eye contact; and average, cooperative, and withdrawn behavior. Tr. 734. Scott had loose associations and a limited fund of knowledge. Tr. 734. The counselor started Scott on a trial of Vistaril for anxiety. Tr. 735.

### 3. Non-medical evidence

In November 2016, Scott's mother, Antoinette, completed a Function Report on Scott's behalf. Tr. 264–72. Antoinette wrote that Scott "suffers with anxiety and depression which makes it difficult for him to work in some environments." Tr. 264. Sometimes he sleeps almost all day and sometimes he doesn't sleep at all. Tr. 265. Scott doesn't care about his appearance; Antoinette

18

prompts him to bathe, but Scott will still not "attend[] to his personal hygiene" for up to 4–5 days. Tr. 265. Scott needs to be "monitored to take his" medication. Tr. 266. He prepares frozen meals and Antoinette doesn't feel safe because Scott is careless—he gets distracted and leaves the water running or forgets that a burner is on. Tr. 266. As to chores, Scott is "not motivated to do anything … he normally doesn't get around to doing them … [h]e constantly needs to be reminded." Tr. 266. Scott doesn't like being around people at times and sometimes people agitate him. Tr. 267. When he leaves the house, Scott walks or rides in a car and he is able to drive. Tr. 267. He shops in stores and mostly goes to the corner store for snacks. Tr. 267. Shopping for personal items like clothing makes him anxious. Tr. 267. Antoinette wrote that Scott is not responsible with his finances—he is "frivolous" and often loses cash and credit cards. Tr. 267. He can pay bills and count change but can't handle a saving account or use a checkbook or money order. Tr. 267. Scott enjoyed listening to music and using the internet; "He gets consumed with the internet and agitated if interrupted" and is often agitated and fixated. Tr. 268. He doesn't socialize often—he visits a relative occasionally and goes to weekly community meetings, which Antoinette takes him to because Scott "doesn't remember to go." Tr. 268. Scott has problems getting along with people because he can become aggressive. Tr. 269. He is withdrawn and he "has trust issues and often paranoia." Tr. 269.

Antoinette indicated that Scott's conditions affect his abilities to talk, complete tasks, concentrate, understand, follow instructions involving more than 2 steps, and get along with others. Tr. 269. She explained that Scott rambles while talking. Tr. 269. He has flights of ideas and racing, obsessive, and paranoid thoughts. Tr. 269. Scott doesn't handle stress well and he shuts down emotionally, becomes depressed, and withdraws. Tr. 270. He likes structure, but that's difficult to maintain due to his mood swings. Tr. 270. Scott's Abilify injections caused "slight agitation" and Seroquel caused "excessive sleeping." Tr. 271.

In July 2017, Antoinette completed a second Function Report and provided the same or similar answers as the first Function Report. Tr. 287–294. Antoinette also wrote that Scott's social anxiety makes it difficult for Scott to work because he struggles with socializing. Tr. 287. Scott stays in bed and seldom comes out of his room. Tr. 288. Some days he can't sleep and other days he sleeps for days in a row. Tr. 288. He needs reminders to bathe, brush his teeth, and comb his hair. Tr. 289. Scott very seldom goes out alone because of paranoia and anxiety. Tr. 289. He doesn't have a driver's license and doesn't drive. Tr. 290. He is unable to pay bills or count change. Tr. 290.

In October 2017, an SSA Field Office representative spoke with Antoinette about Scott. Antoinette stated that Scott's medications make Scott feel exhausted and he has trouble waking up. Tr. 296. He has tremors in his hands. Tr. 296. Sometimes Scott stays in bed in the dark for multiple days in

a row. Tr. 296. Medications seem to decrease Scott's agitation—Scott is able to cope "much better" and is less aggressive. Tr. 296. Scott's medications "seem to work for mood but he is still having depressive episodes." Tr. 296.

### 4. *State agency opinions*[5]

In March 2017, psychologist Carl Tishler, Ph.D., indicated that he considered whether Scott's impairments satisfied listings 12.04, 12.06, and 12.11, and concluded that Scott's impairments did not satisfy those listings.[6] Tr. 454–465. Dr. Tishler found that Scott had moderate limitations in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. Tr. 466.

In December 2017, psychologist Paul Tangeman, Ph.D., agreed with Dr. Tishler's findings. Tr. 525–38.

---

[5] When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

[6] The "listings" are found at 20 C.F.R Part 404, Subpart P, App. 1. They are a catalog of disabling impairments organized by "body systems." Generally, each body system section has an Introduction, which contains information relevant to that system, and a Category of Impairments, which contains each numbered listing. Each listing describes the objective medical and other findings needed to satisfy the criteria of that listing. *Id.*; 20 C.F.R. § 404.1525.

###### 5. *Hearing testimony*

Scott, who was represented by counsel, testified at the administrative hearing held in May 2019. Scott lives with his mother and his mother's boyfriend. Tr. 83. Scott does not drive and has never tried to get a driver's license. Tr. 83. Scott sleeps during the day and is up at night using social media sites like Facebook and Youtube. Tr. 83. He doesn't socialize with friends. Tr. 84. When asked about treatment notes that mentioned Scott having a friend who drove Scott places, Scott testified that he didn't know who that friend was. Tr. 84. Scott stated that he usually doesn't go anywhere, and when he does, he walks. Tr. 84. When asked where he walks to, Scott said that he walks around the corner to his friend's house. Tr. 84. Scott watches his friend play video games and sometimes Scott plays too. Tr. 84. Scott also walks to a nearby McDonald's. Tr. 95–96.

When asked if he does household chores, Scott answered that he takes out the trash. Tr. 85. Scott had been in tenth grade but was no longer in school. Tr. 85. He's trying to get his GED and uses an app on his phone to study. Tr. 85. He used to play football when he was in school but stopped when he began to experience anxiety, depression, and "all kinds of stuff." Tr. 85–86. When asked how his condition affects his ability to work, Scott stated that he is agitated and loses concentration. Tr. 86. When asked when he last had auditory hallucinations, Scott answered, "This week, like off and on, yesterday, last night." Tr. 86. He hears voices criticizing him and the way he lives. Tr. 86.

He hears them almost every day. Tr. 86. His medications control the voices "to some extent." Tr. 86.

When asked to describe his anxiety, Scott stated that his anxiety is "real bad" and prevents him from talking to people. Tr. 87. When asked when he last used drugs or alcohol, Scott answered, "about a year ago." Tr. 87.

Scott's mother, Antionette, also testified at the hearing. Tr. 99. Antoinette stated that when Scott was younger, he did well in school and with friends. Tr. 100. But then Scott lost the desire to go to school and he no longer communicates with his former friends. Tr. 100. Scott heard voices and has anxiety. Tr. 100. Scott tried online schooling but he didn't have the desire to work—he just stayed in his room. Tr. 100. He is withdrawn at family events. Tr. 101. When Scott goes to McDonald's, he orders the same meal so he doesn't have to deal with the anxiety of making choices. Tr. 102. Scott gets anxious standing at the McDonald's counter waiting with other people. Tr. 102. Antoinette used to have to help Scott's order his food but now Scott can do it himself. Tr. 102.

When asked about Scott's hallucinations, Antoinette said that she has seen Scott crawling on the floor saying that someone "is after him or after us." Tr. 102. Scott's injections help him maintain behavioral stability, but Scott still doesn't go out or socialize too much. Tr. 103. Two to three weeks before his next scheduled injection, Scott is anxious, angry, agitated, and not socializing. Tr. 103. When Scott has hallucinations, he doesn't make eye contact and "you can

tell that … maybe he might be talking, but not necessarily." Tr. 103. Antoinette stated that if Scott had to work, he would get agitated and frustrated. Tr. 103. He would misread things that others did. Tr. 103. Sometimes Scott left the room in the middle of a conversation. Tr. 104–05. Scott sometimes starts hyperventilating when Antoinette talks to him and he starts "ripping at his clothes," like his body is overheated from anxiety. Tr. 104. For example, Scott has taken his clothes off and run out into the snow. Tr. 104.

The ALJ asked the vocational expert to determine whether a hypothetical individual with the same age, education, and work experience as Scott could perform any work if the individual had the limitations assessed in the RFC determination, described below. Tr. 108. The vocational expert answered that such an individual could perform the following jobs: dishwasher, automobile detailer, and office cleaner. Tr. 108–09. When asked whether the individual described could perform work if that individual had to work in a socially isolated environment, the vocational expert answered no. Tr. 110.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law

1. Born [i]n October 1998, the claimant had not attained age 22 as of June 30, 2016, the alleged onset date (20 CFR 404.102, 416.120(c)(4) and 404.350(a)(5)).

2. The claimant has not engaged in substantial gainful activity since June 30, 2016, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: major depressive disorder, anxiety, attention deficit hyperactivity disorder (ADHD), and schizophrenia (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can perform unskilled work (SVP 1-2) in an environment free of fast-paced production requirements that involves only routine work place changes. He can have occasional public contact and occasional interaction with co-workers. The claimant can have superficial contact with others, defined as no tasks involving arbitration, negotiation, confrontation, directing the work of others, persuading others, or being responsible for the safety or welfare of others.

6. The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born [i]n October 1998 and was 17 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from June 30, 2016, through the date of this decision (20 CFR 404.350(a)(5), 404.1520(g) and 416.920(g)).

Tr. 63–68.

**Standard for Disability**

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the vocational factors to perform available work in the national economy. *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Id.*

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters*, 127 F.3d at 528. "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting 42 U.S.C. § 405(g)).

A court may not try the case de novo, resolve conflicts in evidence, or decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or a preponderance of the evidence

27

supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

**Discussion**

*1.    Scott is not entitled to relief based on his appointment's clause argument*

Have you ever walked into the middle of a conversation between two people who were talking past each other and not listening to what the other was saying? Maybe each made fair points. But since they were talking about two different things and not responding to each other, it might have been difficult to understand what was going on. Welcome to this issue.

In his first argument, Scott argues that neither the ALJ who decided his case nor the members of the SSA's appeals council were properly appointed by Acting Commissioner Nancy Berryhill nor any later commissioner. Doc. 9, at 21. There's a lot to unpack here, but in a nutshell, he argues that Berryhill served in violation of the Federal Vacancies Reform Act. *Id*. As a result, the argument goes, Berryhill's ratification of the allegedly unconstitutional appointments of the SSA's ALJs was ineffective. *Id*.

Given the potentially wide-ranging effect of Scott's argument, the Commissioner asked for leave to exceed the page-limit on social security briefs so that she could "fully explain why [Scott] is not entitled to relief on [his] constitutional claim." Doc. 10, at 1. I granted the Commissioner's motion. The Commissioner's brief, however, doesn't say a thing about Scott's argument and instead focuses on a different constitutional argument that has lately been featured in the briefs of numerous social security plaintiffs. *See* Doc. 10-1, at 16–26; *e.g.*, *Overstreet v. Comm'r of Soc. Sec.*, No. 1:21-CV-2062, 2022 WL 15524729, at *8 (N.D. Ohio Oct. 11, 2022), *report and recommendation adopted*, No. 1:21-CV-2062, 2022 WL 15522981 (N.D. Ohio Oct. 27, 2022).

Oddly enough, however, Scott filed a reply brief in which he knocks down a number of arguments that he says the Commissioner made in her brief, but that the Commissioner didn't make, at least not in this case. So I'm left with the impression that the Commissioner didn't read Scott's opening brief and Scott didn't read the Commissioner's brief.

In any event, a timeline of events will help place Scott's argument in context:

| | |
|---|---|
| December 2016 | President Obama issued a memorandum providing an order of succession within the SSA that listed the Deputy Commissioner of Operations as first in line to serve as Acting Commissioner in the case of vacancies in the positions of Commissioner and Deputy Commissioner.[7] |

---

[7]     *See* Memorandum Providing an Order of Succession Within the Social Security Administration, 81 Fed. Reg. 96337, 2016 WL 7487744 (Dec. 23, 2016) ("Succession Memo").

| January 21, 2017 | Berryhill, who had been Deputy Commissioner of Operations, assumes role as acting Commissioner[8] |
| March 2018 | Berryhill steps down as acting Commissioner and resumes role as Deputy Commissioner of Operations[9] |
| April 17, 2018 | President Trump nominated Andrew Saul to be SSA's Commissioner; Berryhill assumes title of acting Commissioner[10] |
| June 21, 2018 | Supreme Court issues *Lucia v. SEC*, 138 S. Ct. 2044 (2018), holding the ALJs within the Securities and Exchange Commission are constitutional officers who must be appointed in conformity with the Appointments Clause |
| July 16, 2018 | Berryhill ratified the appointment of ALJs and AAJs and approved their appointments as her own[11] |
| June 17, 2019 | Saul's appointment SSA Commissioner confirmed by the Senate[12] |
| June 25, 2019 | ALJ issues decision in Scott's case |

---

[8]     *Snyder v. Kijakazi*, No. 1:21-CV-103, 2022 WL 4464847, at *17 (N.D. Iowa Sept. 26, 2022).

[9]     *Snyder,* 2022 WL 4464847, at *17. Berryhill's decision to resume her former role was prompted by a Government Accounting Office report that Berryhill's continued service as the acting Commissioner after November 17, 2017, violated the Vacancies Reform Act. *Id.* at *18; *see* https://www.gao.gov/assets/b-329853.pdf (last visited Dec. 14, 2022).

[10]     *Snyder*, 2022 WL 4464847, at *18.

[11]     *See* https://secure.ssa.gov/apps10/reference.nsf/links/ 08062018021025PM (last visited Dec. 14, 2022).

[12]     *See* https://www.congress.gov/nomination/116th-congress/94 (last visited Dec. 14, 2022).

Given this timeline, the gist of Scott's argument is this syllogism: (1) in light of *Lucia*, the SSA's ALJs were historically not appointed in conformity with the Constitution's Appointments Clause, (2) Berryhill had no authority to serve as the acting Commissioner when she ratified the allegedly unconstitutional appointments of the SSA's ALJs, and (3) therefore Berryhill had no authority to ratify any ALJ's unconstitutional appointment, including the ALJ who decided Scott's case. And if the ALJ wasn't validly serving, then Scott's case should return to the agency. Stated simply, I'm not so sure about point one and I disagree with point two. So I can't accept point three, which is Scott's resulting conclusion.

In what is called the Appointments Clause, the Constitution gives the President the power to appoint certain enumerated officers "with the Advice and Consent of the Senate" and the power to appoint:

> all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: *but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments*.

U.S. Const. art. II, § 2, cl. 2 (emphasis added). Under the Constitution, therefore, there are two types of executive officers: principal officers, who are "selected by the President with the advice and consent of the Senate," and inferior officers, whose appointments Congress may vest in the President, the

31

heads of departments, or the judiciary.[13] *See Morrison v. Olson*, 487 U.S. 654, 670 (1988) (quoting *Buckley v. Valeo*, 424 U.S. 1, 132 (1976)).

In *Lucia*, the Supreme Court decided that the Securities and Exchange Commission's ALJs are constitutional officers subject to the Appointments Clause and noted the parties' agreement that the Commission, as the head of a department, could constitutionally appoint them.[14] 138 S. Ct. at 2049–51, 2055 & n.3 (2018); *see* 5 U.S.C. § 3105; 15 U.S.C. § 78d-1(a). Because the Commission's ALJs had historically not been appointed by the commissioners, the Court ordered that Lucia's case had to be reheard, either by the Commission itself, or by a different ALJ who had been appointed in conformity with the Appointments Clause. 138 S. Ct. at 2055.

*Lucia* led to Berryhill's referenced decision, as the acting SSA Commissioner, to "ratif[y] the appointments of [the SSA's] ALJs and [to] approve[] those appointments as her own." *See* Social Security Ruling 19-1p; Titles II and XVI: Effect of the Decision in Lucia v. Securities and Exchange Commission (SEC) On Cases Pending at the Appeals Council, 84 Fed. Reg.

---

[13]    An office requiring Presidential appointment and Senate confirmation is sometimes referred to as a "PAS" office. *See NLRB v. SW General, Inc.*, 137 S. Ct. 929, 934 (2017). In this report and recommendation, I'll refer to that sort of office, the office of a principal officer, as a *principal office*.

[14]    The Court did not decide whether the Commission's ALJs are principal or inferior officers. But because they are "supervised at some level by" the Commissioners, "who were appointed by Presidential nomination with the advice and consent of the Senate," *Edmond v. United States*, 520 U.S. 651, 663 (1997), is it safe to conclude that they are inferior, and not principal, officers.

9582, 9583 (Mar. 15, 2019). Berryhill took this action "[t]o address any Appointments Clause questions involving Social Security claims, and consistent with guidance from the Department of Justice." *Id*. It is not entirely clear whether the SSA acted out of an abundance of caution or based on its concession that its ALJs are inferior officers.

This brings us to the Federal Vacancies Reform Act. As noted, the Appointments Clause requires that principal officers be appointed by the President and confirmed by the Senate. This fact and the reality that confirmation may take time, means that principal offices will inevitably be left vacant at times. *See NLRB v. SW General, Inc.*, 137 S. Ct. 929, 935 (2017). The Vacancies Act deals with these vacancies. It provides that in the event of a vacancy, "the first assistant to the office of such officer shall perform the functions and duties of the office temporarily in an acting capacity subject to the time limitations" in 5 U.S.C. § 3346. 5 U.S.C. 3345(a)(1). But the President may modify this order of succession and direct another person to fill the office "in an acting capacity," subject to the same time limits. 5 U.S.C. § 3345(a)(2)– (3).

Section 3346, in turn, provides:

(a) Except in the case of a vacancy caused by sickness, the person serving as an acting officer as described under section 3345 may serve in the office--
        (1) for no longer than 210 days beginning on the date the vacancy occurs; or
        (2) subject to subsection (b), once a first or second nomination for the office is submitted to the Senate, from the date of such

nomination for the period that the nomination is pending in the
Senate.

> (b)    (1) If the first nomination for the office is rejected by the Senate,
> withdrawn, or returned to the President by the Senate, the person may
> continue to serve as the acting officer for no more than 210 days after
> the date of such rejection, withdrawal, or return.
>> (2) Notwithstanding paragraph (1), if a second nomination for the
>> office is submitted to the Senate after the rejection, withdrawal,
>> or return of the first nomination, the person serving as the acting
>> officer may continue to serve--
>>> (A) until the second nomination is confirmed; or
>>> (B) for no more than 210 days after the second nomination
>>> is rejected, withdrawn, or returned.
> (c) If a vacancy occurs during an adjournment of the Congress sine die,
> the 210-day period under subsection (a) shall begin on the date that the
> Senate first reconvenes.

5 U.S.C. § 3346. The 210-day periods in Section 3346 are modified when a new

President takes office. In that instance, the 210-day periods run from the later

of (1) 90 days after inauguration, or (2) 90 days after the date of a vacancy that

occurs during the 60 days after inauguration. 5 U.S.C. § 3349a(b).

With this background in mind, Scott argues that Berryhill's tenure as

acting Commissioner began in January 2017, and, under the Vacancies Act,

necessarily ended in November 2017. Doc. 9, at 21. *See*

https://www.gao.gov/assets/b-329853.pdf. Based on this premise, Scott says

that Berryhill lacked the authority in July 2018 to ratify the appointments of

the SSA's ALJs. *Id*. And because "[n]o acting or permanent Commissioner" has

since appointed or ratified the ALJs' appointments, he asserts that no SSA

adjudicator, including the ALJ who decided his case, has ever been properly appointed.[15] *Id*. His case, he says, must therefore be remanded. *Id*.

There are several problems with Scott's argument. The first is that Scott assumes that his ALJ (1) is an inferior officer, rather than a "mere employee,"[16] and (2) putting aside Berryhill's July 2018 ratification, was never properly appointed. As to the latter assumption, Scott neglects to explain when his ALJ was appointed or by whom.

As to the former, the Court in *Lucia* concluded that ALJs in the Securities and Exchange Commission were inferior officers because they "exercise … 'significant discretion' when carrying out the same 'important functions'" carried out by the special trial judges in *Freytag v. Commissioner*, 501 U.S. 868, 878 (1991). 138 S. Ct. at 2053. Indeed, both Commission ALJs and special trial judges "have … nearly all the tools of federal trial judges." *Id*. But Scott says nothing about whether SSA ALJs are similarly situated to

---

[15]    In presenting his argument, which barely exceeds one page in length, Scott states "[t]his issue is discussed at length in *Brian T. D. v. Kijakazi*," 580 F. Supp. 3d 615 (D. Minn. 2022)." Doc. 9, at 21. Scott does not explain the reasoning in *Brian T. D.*, much less state whether it supports his position. Implicitly, he invites me to adopt *Brian T. D.* but doesn't bother to explain why I should do that. Worse, he fails to mention that *Brian T. D.* represents the minority view on the issue he raises. *See Snyder*, 2022 WL 4464847. It bears noting that this sort of incorporation-by-reference style of advocacy is neither effective nor appropriate.

[16]    "Mere employee" is the term of art used when distinguishing between Executive Branch constitutional officers and non-officer employees. *E.g.*, *Carr v. Saul*, 141 S. Ct. 1352, 1357 (2021).

Securities and Exchange Commission ALJs.[17] And if Scott's ALJ was an employee rather than an inferior officer, the method of his appointment is constitutionally irrelevant. *Lucia*, 138 S. Ct. at 2051.

Scott, however, says that "[i]t is beyond question that an SSA ALJ or Appeal Council judge … must be properly appointed under the Constitution." Doc. 9, at 20 (citing *Carr*, 141 S. Ct. 1352). I don't doubt this truism; all ALJs and all Executive Branch employees must be properly appointed. But *Carr* doesn't hold that SSA ALJs' appointments were unconstitutional. Instead it holds that social security plaintiffs aren't required, as prerequisite to judicial review, to exhaust constitutional challenges to the ALJs' appointments. *See* 141 S. Ct. at 1362.

There are other problems. Scott ignores the fact that in March 2018, Berryhill stepped down as acting Commissioner and resumed her role as Deputy Commissioner of Operations. *See Snyder*, 2022 WL 4464847, at *18.

---

[17]    Indeed there is reason to doubt that they are similarly situated. *See* Paul R. Verkuil, Reflections Upon the Federal Administrative Judiciary, 39 UCLA L. Rev. 1341, 1349 (1992) (describing the advent of the SSA's use of ALJs as creating "a new category of ALJ who presided over benefactory rather than regulatory decisions," and who "had the unusual distinction of conducting informal rather than formal hearings" and "a lower [pay] grade"); Jeffrey S. Lubbers, Should Congress Create A Special Category of SSA ALJs?, 38 Admin. & Reg. L. News 5, at 6 n.14 (Winter 2013) ("Until the early 1980s, OPM maintained a distinction between GS-15 and GS-16 ALJs with two separate hiring registers. SSA ALJs were in the GS-15 category."); Brief for SSA ALJ Collective as Amici Curiae Supporting Court Appointed Amicus Curiae, Fleming v. Department of Agriculture, No. 17-1246, at 8–10 (D.C. Cir. Feb. 6, 2020), ECF No. 1827361 (arguing that SSA ALJs are employees, not inferior officers); *see also Carr*, 141 S. Ct. at 1358–59 (noting that SSA proceedings are "inquisitorial rather than adversarial").

She did not resume her role as acting Commissioner until April 17, 2018, when President Trump nominated Saul to be SSA's Commissioner. *Id*. Whatever the legality of Berryhill's service from November 2017 to March 2018, that service ended when Berryhill stopped serving as the acting Commissioner.

And, in any event, 5 U.S.C. §§ 3345 and 3346 permitted her to resume her service as the acting Commissioner. Section 3345(a)(2) gives a President the authority to "direct a person who serves in" a principal office, "to perform the functions and duties of the vacant office temporarily in an acting capacity subject to the time limitations of section 3346." Section 3346(a)(2), in turn, provides that "*once*" the President submits a nomination to the Senate to fill a principal office, the official described in Section 3345 may serve "from the date of such nomination for the period that the nomination is pending in the Senate." 5 U.S.C. § 3346(a)(2) (emphasis added); *see Brooks v. Kijakazi*, No. 1:21-CV-609, 2022 WL 2834345 at *18 (M.D.N.C. July 20, 2022); *Lance M. v. Kijakazi*, No. 2:21-CV-628, 2022 WL 3009122, at *13 (E.D. Va. July 13, 2022), *report and recommendation adopted*, No. 2:21-CV-628, 2022 WL 3007588 (E.D. Va. July 28, 2022).

That's what happened here. "Once" President Trump nominated Saul, Berryhill was permitted to assume her role as acting Commissioner during the time Saul's nomination was pending in the Senate. 5 U.S.C. § 3346(a)(2). Berryhill thus validly served as the acting Commissioner from April 2018 through July 2019, when Saul was confirmed. As a result, she had the

authority to issue her July 2018 decision ratifying the appointments of the SSA's ALJs.

It is true that the court in *Brian T. D.* disagreed, holding that the reference in Section 3346(a) to "the person *serving* as an acting officer" under § 3345 "applies to the person *presently* serving in that capacity." 580 F. Supp. 3d at 629 (emphasis added). Respectfully, I disagree. The word *presently* does not appear in the statute and, as another court has remarked, if Section 3346(a)(1)'s time limits "appl[ied] only [to] those who had already served … it would [be] impossible for anyone to serve." *Snyder*, 2022 WL 4464847, at *19 (citing *Brooks*, 2022 WL 2834345 at *18).

The Court in *Brian T. D.* also held that the "or" separating Paragraphs (1) and (2) in Section 3346(a) means that the Paragraphs are mutually exclusive such that once a person serves in an acting capacity for the 210 days in Paragraph (1), she cannot later serve for a different period under Paragraph (2). 580 F. Supp. 3d at 631. As other courts have recognized, however, the use of *or* in Section 3346(a) is more naturally read as being inclusive and denoting alternatives. *Snyder*, 2022 WL 4464847, at *21–22. Under this reading, a person, such as Berryhill, could serve in an acting capacity for the 210 days in Paragraph (1) and then later serve for different period under Paragraph (2). *See Brooks*, 2022 WL 2834345, at *20.

In his reply, Scott raises additional points. But, as noted, the Commissioner did not discuss the issue Scott raised. While a plaintiff can

respond in a reply brief to points raised in a defendant's brief, the plaintiff is not permitted to raise new issues. So the points raised in Scott's reply are necessarily new points that are not made in response to the Commissioner's brief. They are therefore not properly before the Court and need not be considered.

2. *Scott is not entitled to relief based on his step 3 arguments*

At step 3, the ALJ considered whether Scott's impairments satisfied Listing 12.04, *Depressive, bipolar and related disorders*, and Listing 12.11, *Neurodevelopmental disorders*.[18] Tr. 64. Scott argues that the ALJ erred because he didn't consider Listing 12.03, *Schizophrenia spectrum and other psychotic disorders*; Listing 12.06, *Anxiety and obsessive-compulsive disorders*; and Listing 12.15, *Trauma- and stressor-related disorders*. Doc. 9, at 24–25.

At step 3 of the disability evaluation process, a claimant will be found disabled if his or her impairments meets or equal one of the listings in the Listing of Impairments. 20 C.F.R. § 404.1520(a)(4)(iii). The claimant bears the burden of establishing that any condition meets or equals a listing. *Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 727-728 (6th Cir. 2004) (citing *Buress v. Sec'y of Health & Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987)). A claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which

---

[18]    I cite the version of the listings which were in effect at the time of the ALJ's June 2019 decision, 20 C.F.R. § Pt. 404, Subpt. P, App. 1 (effective March 14, 2018, to April 1, 2021).

describes how the impairment has such equivalency." *Id*. at 728 (citing *Evans v. Sec'y of Health & Human Servs*., 820 F.2d 161, 164 (6th Cir. 1987)). "Each listing specifies the objective medical and other findings needed to satisfy the criteria of that listing" and a claimant "must satisfy all the criteria to 'meet' the listing." *Reynolds v. Comm'r of Soc. Sec*., 424 F. App'x 411, 414 (6th Cir. 2011). "[A] claimant is also disabled if her impairment is the *medical equivalent* of a listing[.]" *Id*. There is no heightened articulation standard at step 3. *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006).

To satisfy Listing 12.04—which the ALJ considered—and the listings the ALJ didn't consider—12.03, 12.06, and 12.15—a claimant must satisfy the "paragraphs A and B" criteria or the "paragraphs A and C" criteria. *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00A2. The *paragraph B* criteria, which includes 4 functional areas, is the same for all those listings: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting and managing oneself. *Id*. at 12.00A2b, 12.00E. To satisfy the *paragraph B* criteria, the claimant must have a "marked" limitation in 2 or more areas or an "extreme" limitation in one area. *Id*. at 12.00F2. Here, the ALJ found that Scott had a "moderate" limitation in all 4 areas of functioning, so Scott didn't satisfy the *paragraph B* criteria. Tr. 64. Scott doesn't challenge the ALJ's *paragraph B* finding.

The ALJ also found that Scott didn't satisfy the *paragraph C* criteria. Tr. 64. The *paragraph C* criteria is also the same for all the listings cited

above—12.03, 12.04, 12.06, and 12.15. *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00A2c, 12.00G. To satisfy the *paragraph C* criteria, the evidence must show that the claimant relies, "on an ongoing basis, upon medical treatment, mental health therapy, psychosocial support[s], or highly structured settings to diminish the symptoms and signs of [the claimant's] mental disorder." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00G2b. And the evidence must show that, "despite … diminished symptoms and signs, [a claimant] has achieved only marginal adjustment." *Id*. at 12.00G2c.

> "Marginal adjustment" means that your adaptation to the requirements of daily life is fragile; that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life. We will consider that you have achieved only marginal adjustment when the evidence shows that changes or increased demands have led to exacerbation of your symptoms and signs and to deterioration in your functioning; for example, you have become unable to function outside of your home or a more restrictive setting, without substantial psychosocial supports (see 12.00D). Such deterioration may have necessitated a significant change in medication or other treatment. Similarly, because of the nature of your mental disorder, evidence may document episodes of deterioration that have required you to be hospitalized or absent from work, making it difficult for you to sustain work activity over time.

*Id*.

The ALJ found that Scott didn't satisfy the *paragraph C* criteria and explained, "[Scott] is able to care for his own needs and does not allege otherwise." Tr. 64. Scott objects to the ALJ's finding, arguing that it was "cursory." Doc. 9, at 22. But he does not challenge the ALJ's finding that he can care for his own needs. Also, the ALJ's decision must be read as a whole, and reversal is "not warranted" when the ALJ's conclusion is "sufficiently

41

supported by factual findings elsewhere in decision that need not be repeated." *Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 455 (6th Cir. 2016). Here, in the paragraphs before the ALJ's *paragraph C* finding, the ALJ explained that Scott can attend medical appointments, take medication, play games, use the internet, follow instructions and respond to questions from healthcare providers, spend times with friends and family, and reside with others. Tr. 64. The ALJ observed that Scott was described as pleasant, cooperative, and comfortable during appointments. Tr. 64. The ALJ commented that Scott had "no problems getting along well with providers and staff" and presented with appropriate grooming and hygiene. Tr. 64. Scott doesn't challenge any of those findings.

Later in the decision, the ALJ remarked that Scott took his medications as prescribed and that he and his mother reported that his symptoms improved with medication. Tr. 66. Despite displaying signs of anxiety and depression at counseling sessions, Scott maintained a logical thought process, no cognitive deficits, good insight and judgment, and cooperative behavior. Tr. 66. When Scott reported that his auditory hallucinations had returned, his doctor adjusted his medication, which helped. Tr. 66. Scott continued to go to counseling sessions, which were "unremarkable in nature" and where he made progress with symptom control. Tr. 66–67. And the ALJ gave "great" weight to the state agency reviewers' opinions and "some" weight to the consultative examiner. Tr. 67. Scott doesn't challenge any of those findings. All the above

are factual findings that "sufficiently support[]" the ALJ's *paragraph C* criteria. *Crum*, 660 F. App'x at 455.

Scott identifies other evidence that he believes supports a finding that he satisfies the *paragraph C* criteria. Doc. 9, at 23. Scott writes that his mother "assist[s]" him getting to appointments and monitors his medications; he has a case worker; and he could not "get it together enough to go to school," never graduated, and never got a driver's license.[19] *Id.*; Doc. 11, at 6. But even if that evidence could support Scott's position, this Court cannot overturn the ALJ's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. As detailed above, substantial evidence supports the ALJ's decision, so it must be affirmed. *Id.*

As for Scott's argument that the ALJ erred when he didn't consider Listings 12.03, 12.06, and 12.15, Scott hasn't explained how his impairments satisfy those listings. All those listings require Scott to establish the *paragraphs B* or *C* criteria and the ALJ found that he didn't establish either one. *See Thacker*, 93 F. App'x at 727–28 (The claimant bears the burden of establishing that any condition meets or equals a listing). Scott's reliance upon *May v. Comm'r of Soc. Sec.*, 4:10-CV-1533, 2011 WL 3490186, at *7–9 (N.D. Ohio June 1, 2011),[20] and *Reynolds*, 424 F. App'x at 415–16, are misplaced

---

[19]    Scott doesn't identify evidence in the record showing that his lack of driver's license is due to his impairments.

[20]    Report and recommendation adopted, No. 4:10-CV-1533, 2011 WL 3490229 (N.D.Ohio Aug. 10, 2011).

because in both cases the court found that the ALJ erred when he only considered the listing relevant to claimant's mental impairments and didn't consider the listing relevant to the claimant's physical impairments. In *Colvin v. Comm'r of Soc. Sec.*, No. 5:13-CV-2674, 2015 WL 1471769, at *2 (N.D. Ohio Mar. 31, 2015), the court reversed because "there [was] no analysis of any kind with respect to the Listing." So *Colvin* doesn't support Scott's position, either.

Finally, Scott asserts that he "suffered trauma" and states, "The ALJ is under a duty to ensure that the record is fully and fairly developed." Doc. 9, at 25. This argument is waived. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (internal citations omitted). And Scott's reliance on evidence that he submitted to the Appeals' Council after the ALJ's decision is not proper. Doc. 9, at 19. The Appeals Council considered the evidence but declined to review Scott's application on the merits (Tr. 1–2) and Scott has not requested a sentence six remand for the ALJ to consider new and material evidence. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996) ("[W]here the Appeals Council considers new evidence but declines to review a claimant's application for disability insurance benefits on the merits, the district court cannot consider that new evidence in deciding

44

whether to uphold, modify, or reverse the ALJ's decision.") (citing *Cotton v. Sullivan*, 2 F.3d 692, 695–96 (6th Cir. 1993)).

For all these reasons, Scott's challenge to the ALJ's decision fails.

**Conclusion**

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: December 14, 2022

*/s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019).